**LYNCHBURG GAS COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

Atlantic Seaboard Corporation et al.,
Intervenors.

**No. 17738.**

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 21, 1963.

Decided June 26, 1964.

Mr. Morton L. Simons, Washington, D. C., for petitioner.

Miss Josephine H. Klein, Atty., Federal Power Commission, with whom Messrs. Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol. and Abraham R. Spalter, Asst. Gen. Counsel, Federal Power Commission, were on the brief, for respondent.

Mr. Peter H. Schiff, Atty., Federal Power Commission, also entered an appearance for respondent.

Mr. Edward S. Pinney, New York City, with whom Messrs. Giles D. H. Snyder and William C. Hart, New York City, were on the brief, for intervenors.

Before FAHY, WASHINGTON and BURGER, Circuit Judges.

PER CURIAM.

The judgment of the court is that the order of the Commission under review in this proceeding is set aside and the case is remanded to the Commission for further proceedings. Judge Fahy states his reasons in an opinion in which Judge Washington concurs except Part II which discusses the contention of petitioner that the approved rate is an unreasonable restraint upon trade and is discriminatory in violation of the antitrust laws. Judge Washington files a separate concurring opinion in which Judge Fahy concurs except he believes a decision of the antitrust issue would be appropriate.

Judge Burger also files an opinion, dissenting in part and concurring in part.

FAHY, Circuit Judge.

Lynchburg Gas Company petitions for review of an order of the Federal Power Commission authorizing a rate schedule of the Atlantic Seaboard Corporation, a pipeline affiliate of the Columbia Gas System. The rate is applicable to Seaboard's sales to resale customers which obtain less than their full requirements from Seaboard. Lynchburg has been a small customer of Seaboard since 1947, serving the City of Lynchburg and thereabouts, and until 1961 obtained its total requirements from Seaboard. Since then, however, it has purchased, with Commission permission, a portion of its supply from Transcontinental Gas Pipe Line Corporation (Transco), whose pipeline, originating in the Texas Gulf Coast area and traversing Virginia on a course approximating that of Seaboard, supplies primarily the populous markets in the Middle Atlantic Seaboard area.

Seaboard's basic rate structure is a combination of a demand and a commodity charge. The demand charge takes care of approximately half the cost to Seaboard of its necessary facilities, and is billed on the basis of the maximum volume a buyer has the right to take, though no gas is taken. The commodity charge is designed to recover the other half of Seaboard's fixed costs and also its variable costs, and is billed on the basis of the gas actually taken. The larger the volume the lower the unit cost,

since the demand charge is then spread over a larger number of units.

At the time of the hearing Seaboard's rate applicable to the area here affected was $3.25 per Mcf. demand charge and 32.18¢ per Mcf. commodity charge, so that at 100% load factor [1] the unit cost was 42.9¢ per Mcf. and at 50% load factor was 53.5¢ per Mcf.[2] Transco's rates applicable to Lynchburg are lower than Seaboard's. They were $3.10 per Mcf. demand, and 28¢ per Mcf. commodity, but were reduced in February 1963 to $2.91 per Mcf. demand and 27.3¢ per Mcf. commodity.

In view of the fact that Lynchburg under a long-term service agreement with Seaboard remains bound to pay Seaboard's demand charge, it serves Lynchburg's interest to continue purchasing part of its supply from Seaboard. However, Lynchburg would benefit by so apportioning its purchases between Seaboard and Transco as to yield the lowest average unit cost, and could do this were it able to purchase at a high load factor from Transco, thus taking full advantage of the latter's low commodity charge.[3]

Seaboard filed under Section 4(d) of the Natural Gas Act a proposed commodity-demand "partial requirements" (PR) rate to supplement its previous rate. The ensuing proceedings led to a decision by the Commission to modify, and as modified to approve, a Seaboard schedule of rates which would require Lynchburg and other "partial requirements" customers in certain circumstanc-

---

1. "Load factor" is the ratio between a buyer's average daily purchases and its contract demand, the maximum volume it has a right to take under its contract.

2. There is also a "facility charge" for services rendered by means of a lateral supply line. This charge is applicable to Lynchburg.

3. Aside from Lynchburg's contractual obligations to Seaboard it would still seem to be in Lynchburg's interest for it to apportion its purchases between Seaboard and Transco. Transco's rates presently applicable to Lynchburg are based on Transco's "G" schedule which applies

only to customers with contract demands of 5,000 Mcf. or less. Transco's regular "CD–2" schedule at the time of the hearing provided for a minimum demand charge of $3.70 per Mcf. and a commodity charge of 25¢ per Mcf. If Lynchburg were so to increase its purchases form Transco as to exceed the "G" schedule limit it would then have to pay the higher demand charge provided for in Transco's "CD–2" schedule. And under this schedule it would seem that Lynchburg would benefit by apportioning its purchases between Seaboard and Transco so as to purchase from the latter only a high load factor.

es to pay a minimum commodity charge not required to be paid by full requirements customers. The effect of this charge is to require the partial requirements customer to purchase from Columbia or to pay for, even if not actually used, a minimum volume of gas both annually and monthly. This rate becomes effective as to Lynchburg should its purchases from Transco cause it to take from Seaboard less than a certain amount calculated on the basis of eighty per cent of Lynchburg's base-period [4] load factor. Also included in the approved schedule are provisions which permit the minimum charge to be redetermined if Lynchburg's industrial sales increase or decrease by ten per cent. Lynchburg's present petition is for review of the rate schedule as approved.

The justification the Commission found for the PR rate is that approximately half of Seaboard's fixed costs are allocated to its commodity charge, and if Lynchburg were to reduce its commodity payments by reducing its base load purchases it would cut down its contribution to Seaboard's fixed costs. The Commission reasoned that if this reduction were substantial Lynchburg would cease to bear its fair share of such fixed costs. Since Seaboard must recover these costs if it is to remain in business the result would be that other Seaboard customers would be obliged to assume a disproportionate share by paying higher rates. This, the Commission concluded, would place an undue burden upon customers not having a second source of supply.

### I.

■ The Commission first contends that Lynchburg is not a party aggrieved under Section 19(b) of the Act and its petition accordingly should be dismissed. The Commission says the record is devoid of evidence to support Lynchburg's contention that the PR rate schedule unreasonably restrains competition to Lynchburg's disadvantage. We think "aggrievement" does not depend upon a resolution of this question. There is aggrievement when a customer's rate is increased, or other economic injury is likely to flow from the action sought to be reviewed. The former is illustrated by Associated Indus. of New York State v. Ickes, 134 F.2d 694 (2d Cir.), vacated for mootness, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943), the latter by the leading case of Federal Communications Comm'n v. Sanders Bros. Radio Station, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940). And see the cases reviewed in Philco Corp. v. Federal Communications Comm'n, 103 U.S.App.D.C. 278, 257 F.2d 656 (1958), cert. denied, 358 U.S. 946, 79 S.Ct. 350, 3 L.Ed.2d 352 (1959). But the Commission points out that the PR rate, even if it might theoretically have an economic impact upon Lynchburg in the future, has none at present. Accepting Lynchburg's statement that the base period which would be used to determine the minimum bills would be the period of highest load factor in Lynchburg's history—66%—the Commission says the order would impose a minimum commodity bill at a load factor of 52.8%, and Lynchburg does not allege that its load factor has ever been, or that it probably might be, lower than this in any reasonably foreseeable conditions. Lynchburg, countering, states *inter alia* that in order to avoid a "penalty" under Seaboard's minimum annual bill provision for the twelve months ended October 31, 1962, it was forced to cut back on its supply from Transco in June, July, August, September, and October, 1962.

■ Assuming that Lynchburg will currently not be required to pay more under the new rate or, to avoid doing so, to take less gas from Transco than otherwise it would do, the fact is that the PR rate is designed to and has the purpose of restraining Lynchburg's freedom of action in obtaining its supply. This purposeful exercise of control by the Commission over the freedom of Lynchburg aggrieves it. See Columbia Broadcasting System, Inc. v. United States, 316

---

4. A customer's base period is the two year period prior to its becoming a partial requirements customer.

U.S. 407, 422, 62 S.Ct. 1194, 86 L.Ed. 1563 (1942); City of Pittsburgh v. Federal Power Comm'n, 99 U.S.App.D.C. 113, 237 F.2d 741 (1956). Moreover, as a practical matter the time for review is now, within the statutory period after the action sought to be reviewed is taken, and not after the rendition of a bill contested as not due because of the invalidity of a rate long since approved. Aggrievement need not await this, in light of the intended influence of the order upon the business operations and management decisions of Lynchburg.

## II.

Coming to the merits the principal contention of Lynchburg is that the PR rate is an unreasonable restraint upon trade and is discriminatory in violation of the antitrust laws. While the Commission is not responsible for the enforcement of these laws, nevertheless, as the Commission recognized, "part of the content of 'public convenience and necessity' as used in § 7 of the Natural Gas Act is found in the laws of the United States. City of Pittsburgh v. Federal Power Comm'n, 99 U.S.App.D.C. 113, 237 F.2d 741." California v. Federal Power Comm'n, 369 U.S. 482, 484–485, 82 S.Ct. 901, 903, 8 L.Ed.2d 54 (1962). So, too, as to Sections 4 and 5 of the Act. United States v. Philadelphia National Bank, 374 U.S. 321, 353–354, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

The rate has anti-competitive features, but private enterprise subject to the Act is not free to compete without some public restraint essential to the accomplishment of the purposes of the Act. See United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12, decided April 6, 1964. Invalidity is not necessarily found in a reasonable difference in rates charged the same customer by different sources of supply, or in rates charged different customers by the same source, assuming the reasonableness and justness of the rates insofar as price is concerned, not here challenged, and assuming, also, that the factors claimed to justify the difference have adequate support in the findings of the Commission and in the record. Under the Natural Gas Act the difference must not amount to an "undue preference or advantage * * * undue prejudice or disadvantage, or * * * unreasonable difference * * *." Section 4(b); or be "unjust, unreasonable, unduly discriminatory, or preferential." Section 5(a). But these terms are to be given application in light of the duty of the Commission to control by certificates of public convenience and necessity, under Section 7(c), the construction and extension of facilities. While the major purpose of such control is protection of the consuming public from exploitation through unreasonable or unjust charges —F.P.C. v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 88 L.Ed. 333 (1944)—this is not necessarily accomplished by permitting a pipeline customer seeking to use a new and partial source of supply to be free of a rate needed to sustain the ability of that customer's original supplier to serve its customers at reasonable and just rates which impose no greater portion of its fixed costs upon its full requirement customers than their fair share, compared with the portion borne by the customer who resorts to the new source for part of its requirements.

It is not contended the PR rate schedule is illegal per se under the antitrust laws, and I think it is not. Nor is monopoly involved, as it was in Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 83 U.S.App.D.C. 297, 169 F.2d 881, cert. denied, 335 U.S. 854, 69 S.Ct. 81, 94 L.Ed. 402 (1948). Though competition is involved its restraint is through a rate designed to require each customer to bear its fair burden. The Commission states the matter as follows:

* * * If the competitors have lower commodity rates it is obvious that Columbia customers having an alternate source of supply will tend to give all of the high load factor business to the alternate source in order to take advantage of the low commodity rates but will still be able

to take advantage of Columbia's low demand rates, and at peak periods obtain, in effect, peaking service from Columbia at relatively low rates. It is not hard to conceive that the end result might be that the customers of Columbia would without access to alternate suppliers end up supporting peaking service for Columbia's partial requirements customers at rates never intended for such service.

I think there is no such discrimination or preferential treatment inherent in the PR rate as calls for its invalidation regardless of the reasons assigned for it, if these find support in the record. To repeat, the difference is due to the fact, if it be a fact, that unless at a certain point a different rate in the form of a minimum commodity charge is paid by Lynchburg then Seaboard's other customers will lose Lynchburg's contribution to Seaboard's fixed costs, a loss which would ultimately be reflected in the rates charged the other customers. I cannot say that the restraint at the point at which this occurs—that is, at which the PR rate becomes operative against Lynchburg—unduly interferes with its freedom in utilizing the Transco source of supply. In sum I think that the basis for the PR rate, if sustained by the record, precludes its invalidation under the antitrust laws—including Section 3 of the Clayton Act,[5] as well as Section 2(a) of the Robinson-Patman Act [6]—and also removes it from the prohibitions of Section 4(b) of the Natural Gas Act. I accordingly reach the question whether the basis for the PR rate is supported by the record.

### III.

The Commission contends, as we have indicated, that the PR rate is necessary "to protect the many customers dependent upon the Columbia companies from being required to pay the higher rates which may result from the deteri-

oration of some of Columbia's markets." This conclusion, while entitled to respect, see Federal Communications Comm'n v. RCA Communications, Inc., 346 U.S. 86, 96–97, 73 S.Ct. 998, 97 L.Ed. 1470 (1953), cannot be accepted without the support of subsidiary findings based on the record. We think findings so supported are lacking.

First, although the Commission states it was protecting the interests of Columbia customers without access to an alternate source of supply, which of Columbia customers are so situated is not shown. It appears that few lack such access. It is difficult to see how the Commission could have arrived at a meaningful balance between the interests of consumers with and without access to a second supply source. This deficiency is important; for the protection of the unlisted group of Columbia customers having no alternate source of supply in large part will be at the expense of the ultimate consumers served by those Columbia customers which could and probably would, were it not for the PR rate, purchase some of their gas from suppliers other than Columbia at lower rates; for to the extent that the PR rate denies those companies the opportunity to purchase gas at lower rates from other sources, it is denying them an opportunity to lower their rates to their ultimate consumers.

A related difficulty is the lack of evidence showing the extent of deterioration in Columbia's markets that might be expected absent the PR rate. Even should there be a substantial decline in Seaboard's sales to Lynchburg, or some other customer similarly situated, this loss might be more than offset by an increase in other sales. This possibility was pointed out by the hearing examiner when he stated: "At the present time Columbia's estimates of increase in future demands off its system is more than 25 percent during the next five years and it is seeking substantial additional supplies of gas to meet the increasing demands."

---

5. 38 Stat. 731 (1914), 15 U.S.C. § 14 (1958).

6. 49 Stat. 1526 (1936), as amended, 15 U.S.C. § 13(a) (1958).

In the face of this the Commission could not simply assume that disapproval of the PR rate would result in such a substantial deterioration of Columbia's markets as to necessitate an increase in Columbia's general rates and thus place an unfair burden upon Columbia's less favorably situated customers.

Columbia did make some attempt to supply proof by reference to the experience of a Columbia affiliate, Home Gas Company, and two of its customers, Central Hudson Gas & Electric Corp. and Orange & Rockland Utilities, Inc. Both of these companies formerly received their full requirements from Home, but in 1955 and 1957 with Commission approval began to purchase part of their supply from another pipeline. The Commission points out that while it attempted to protect Columbia and its customers by placing a volumetric limit on the amount of gas the two companies could purchase from the second source, Home during the summer months lost its entire sales to Central and "practically all of its sales in the eastern distribution area of Rockland."

The force of the above example was considerably weakened by the hearing examiner's finding that while "the total sales by Home to Rockland disclose a slight decline in the year 1956 [the year after authorization of purchases from the second source] * * *, in 1957 the sales were higher than in previous years and have increased steadily thereafter. The load factor of purchases from Home has remained for all practical purposes for the years shown at about the same level." A more important deficiency in the Home-Central-Rockland example was also pointed out by the hearing examiner when he said: "While Columbia points out the pattern of purchases by these two companies * * * it did not show as a result of purchases from another pipeline company that any financial injury has occurred either to itself or other customers, or that any difficulty has been experienced in disposing of the volumes of gas not taken by Central and Rockland." [7] Of course these findings of the hearing examiner do not bind the Commission, but the Commission has not made other findings.

■■ True it is that proof of certain facts might be unavailable, or such proof as is available might be highly speculative or lacking in some other respect, and in such cases no doubt the courts should accord Commission expertise a broader range than ordinarily. See Federal Communications Comm'n v. RCA Communications, Inc., supra; Federal Power Comm'n v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 28–29, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961). However, there is no present indication that this is such a case. Accordingly we think the absence of further evidence in support of findings in the respects referred to renders the record insufficient to justify the restraint imposed by the PR schedule. Where restraint is due to a compulsory tax imposed by a seller upon a buyer that fails to purchase a stipulated percentage of its needs from the seller the validity of the restraint must be supported by more than judicial speculation that it is justified.

■ Moreover, even assuming that some form of PR rate is warranted the record does not demonstrate that the particular schedule approved meets public interest requirements [8] under the standard stated by Mr. Justice Brennan in White Motor Co. v. United States, 372

---

7. In a further attempt to show the necessity of the PR schedule Columbia introduced a hypothetical study predicting the effect upon the Columbia companies of a substantial loss in base load sales. However, the trial examiner dismissed the probative value of this study, saying that it was speculative, based on unproven assumptions and contained mere assertions of possibility.

8. It should be noted that minimum commodity bills for partial requirements customers are fairly common throughout the natural gas industry. However, the fact that other PR schedules might be valid does not mean that the schedule now under review is similarly valid.

U.S. 253, 270, 83 S.Ct. 696, 705, 9 L.Ed. 2d 738 (1963) (concurring opinion):

"Another issue which seems * * * particularly to require a full inquiry into the pros and cons of these territorial restrictions is whether, assuming that some justification for these limitations can be shown, their operation is reasonably related to the needs which brought them into being. To put the question another way, the problem is not simply whether some justification can be found, but whether the restraint so justified is more restrictive than necessary * * *."

■ Finally Lynchburg particularly challenges one important feature of the schedule approved by the Commission. It is provided that the minimum bill under the PR rate shall be redetermined upon a ten per cent increase in the customer's industrial sales. The record does not make clear precisely what is meant by "redetermined" or what effect a redetermination can be expected to have; so it is impossible at this time to pass upon the reasonableness of such a provision. The inference from the Commission's opinion is that the minimum bill is to be increased upon a ten per cent increase in the customer's industrial sales. Should future events bear this inference out, thereby causing injury to Lynchburg, the validity of the redetermination provision can then be tested.

WASHINGTON (Circuit Judge, concurring in the result): Since the Commission failed to make findings necessary to support, and thus to enable us to review, its conclusions under the standards of the Natural Gas Act, it is not necessary to decide: (a) the extent to which the antitrust laws control; (b) if they do control, whether regulatory considerations are relevant to determining a violation; (c) whether the P-R schedule here challenged is in violation of the antitrust laws properly construed; and (d) whether this court may or should consider whether the antitrust laws have been violated on a petition to review an order of an administrative agency which does not have jurisdiction to apply (and thus has made no findings under) the antitrust laws. These questions are extremely complex, and should not—I think—be considered where there is abundant reason to reverse the administrative determination on another ground. I therefore do not concur in Judge Fahy's discussion of these problems in Part II of his opinion, though I do concur in the remainder and in the result reached.

■■ Whatever the relevance of the antitrust laws, the welfare of the ultimate consumer is the acknowledged desideratum of the Natural Gas Act. See, e. g., Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944): "The primary aim of this legislation was to protect consumers against exploitation at the hands of natural gas companies"; Panhandle Eastern Pipe Line Co. v. Federal Power Commission, 83 U.S.App.D.C. 297, 300, 169 F.2d 881, 884, cert. denied, 335 U.S. 854, 69 S.Ct. 81, 94 L.Ed. 402 (1948): "[N]othing in the Natural Gas Act suggests that Congress thought monopoly better than competition or one source of supply better than two, or intended for any reason to give an existing supplier of natural gas for distribution in a particular community the privilege of furnishing an increased supply"; Public Service Commission of State of New York v. Federal Power Commission, 257 F.2d 717, 720 (3d Cir. 1958), aff'd sub nom. Atlantic Refining Co. v. Public Service Commission, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed.2d 1312 (1959); Central Illinois Public Service Co., 4 F.P.C. 1043 at 1044–45 (1945); and Lynchburg Gas Co., 24 F.P.C. 955 at 958 (1960).[1] In-

---

1. "The evidence shows that *the savings in costs will be substantial if Lynchburg is permitted to purchase part of its gas from Transco. Under Lynchburg's rules and regulations such savings will* *be passed on to its customers in the form of a reduction in the general service rate.*" This was the Commission's own language in authorizing service from Transco. (Emphasis added).

vestors in the natural gas industry, although granted an *opportunity* for a "fair return", are by no means guaranteed freedom from risk or competition. Such assurance would, in a case such as this, deprive competitors of the right to compete, inhibit efficient allocation of resources and deny ultimate consumers the lowest prices to which they are entitled.

In order to determine whether the P-R rate is consistent with the welfare of ultimate consumers, the Board should consider at least the following: (a) The restraint brought about by the P-R rate on the ability of Lynchburg, and other partial requirements customers, to do business with the lowest-cost source of supply, or, put in terms of the exclusive dealing cases, the extent to which the P-R rate forecloses, or tends to foreclose, competitors of Columbia from a substantial share or shares of a substantial market or markets; (b) the individual and total increase in costs which would be borne by full requirements customers in the absence of the P-R rate, if the Commission permitted Columbia to raise its rates to that level which would provide a "fair return" ;[2] (c) if either alternate is substantially restrictive, whether the "fair return" could be appropriately reduced, to minimize the burden to customers.[3]

BURGER, Circuit Judge (dissenting in part and concurring in part): I am unable to conclude that appellant has standing. However, since the majority decides that appellant has standing, I agree with their disposition of the case on the merits, and apart from the question of standing, I would concur in Judge Washington's opinion and Judge Fahy's opinion except Part II.

2. In this connection it is relevant to note Lynchburg's contention that substantially all of Columbia's sales are to customers that have access to alternate sources of supply.

3. Were it found that the P-R schedule were less restrictive and that the restriction was the minimum compatible with a reasonable concept of "fair return", it would still be necessary to determine whether Lynchburg was being required to

bear an "excessive" share of the burden. The Commission should also ascertain so far as it is administratively practicable the extent to which suppliers in competition with Columbia, such as Transco, will be forced to raise their rates, as a result of the business taken by Columbia under the P-R schedule. And the Commission should also make clear what it means by "fair return" and "fair share."