759 F.2d 945
 245 U.S.App.D.C. 219
 MISSISSIPPI RIVER TRANSMISSION CORPORATION, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Mobile Gas Service Corporation, Mississippi Valley Gas
Company, Clark-Mobile Counties Gas District, Louisiana Gas
Service Company, Entex, Inc., United Gas Pipe Line Company,
Atlanta Gas Light Company, Southern Natural Gas Company,
Texas Eastern Transmission Corporation, Missouri Public
Service Commission, Intervenors.
LACLEDE GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
 Nos. 84-1046, 84-1049.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 25, 1985.
Decided April 19, 1985.
 
 Roy R. Robertson, Jr., Birmingham, Ala., with whom Paul E. Goldstein, Chicago, Ill., was on brief, for petitioner Mississippi River Transmission Corp. in No. 84-1046.
 Kenneth J. Neises, Washington, D.C., was on brief, for petitioner Laclede Gas Co. in No. 84-1049.
 Joseph S. Davies, Atty., F.E.R.C., Washington, D.C., with whom Jerome M. Feit, Sol. and Michael E. Small, Atty., F.E.R.C. Washington, D.C. were on brief, for respondents in Nos. 84-1046 and 84-1049.
 Irving Jacob Golub, Washington, D.C., with whom Phillip D. Endom, Houston, Tex., was on brief, for intervenor United Gas Pipe Line Co. in No. 84-1046.
 Michael J. Manning, Patrick J. Keeley and James F. Moriarty, Washington, D.C. were on brief, for intervenors Entex, Inc., et al. in No. 84-1046.
 John M. Kuykendall, Jr., Jackson, Miss., and J. Michael Marcoux, Washington, D.C. were on brief, for intervenors Mobile Gas Service Corp., et al. in No. 84-1046.
 John E. Holtzinger, Jr., John T. Stough, Jr. and Robert I. White, Washington, D.C. entered appearances for intervenor Atlanta Gas Light Co. in No. 84-1046.
 Cheryl M. Foley, Houston, Tex., entered an appearance for intervenor Texas Eastern Transmission Corp. in No. 84-1046.
 James J. Cleary, Birmingham, Ala., and James J. Flood, Park Ridge, Ill., entered appearances for intervenor Southern Natural Gas Co. in No. 84-1046.
 Eric A. Eisen, Washington, D.C. entered an appearance for intervenor Missouri Public Service Com'n in No. 84-1046.
 Before ROBINSON, Chief Judge, and TAMM and WALD, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 WALD, Circuit Judge:
 
 
 1
 The petitioners in these consolidated cases seek review of a Federal Energy Regulatory Commission ("FERC" or "the Commission") order authorizing United Gas Pipe Line Company ("United") to impose a so-called minimum commodity bill on one class of its customers. The minimum bill requires United's pipeline customers to pay a penalty if they do not purchase a minimum quantity of gas from United each year. The petitioners, Mississippi River Transmission Corporation ("MRT") and Laclede Gas Company ("Laclede"), argue that the minimum bill does not constitute a "just and reasonable" charge under the Natural Gas Act ("the Act") and that it unlawfully discriminates among United's customers. See 15 U.S.C. Secs. 717c(a), (b). Although we uphold the Commission's rejection of the petitioners' discrimination claim, we conclude that FERC's approval of United's minimum bill under its own regulatory standards was not based on substantial record evidence. We therefore set aside the Commission's order and remand for further proceedings consistent with this opinion.
 
 I. THE BACKGROUND
 
 2
 A. Minimum Bill Commodity Bills and Their Regulation
 
 
 3
 United, a major interstate natural gas pipeline company, supplies gas to three classes of customers: (1) interstate pipeline companies, (2) local distribution companies or so-called city gate customers, and (3) end-user industrial or power plant customers.[1] MRT is one of United's principal pipeline customers, and Laclede is MRT's largest customer.[2] United's rate structure consists of separate "demand" and "commodity" components. The commodity charge includes the variable costs of supplying customers with natural gas and 75 percent of the fixed costs of providing service.[3] The remainder of United's fixed costs is included in the demand charge. While United's customers are contractually required to pay the demand charge regardless of how much gas they take, the commodity charge is levied on each unit of the gas actually purchased. This two-part rate structure is generally imposed on both "partial requirements" and "full requirements" customers. Partial requirements customers, such as United's pipeline customers, do not rely solely on one supplier for their gas supply; instead, they have the ability to "swing" from one supplier to another in order to purchase the cheapest available gas. Full requirements customers, such as United's city gate customers, generally purchase their entire gas supply from one pipeline and are thereby captive to that pipeline's rates.
 
 
 4
 As FERC has recently observed, the presence of partial requirements and full requirements customers on a pipeline system creates certain difficulties for rate regulation in a competitive market.
 
 
 5
 There is some tension inherent in the relationship between full and partial requirements customers. ... Interstate pipeline systems were designed based on the estimated markets of both full and partial requirements customers. Large scale investments were made to provide physical facilities and long-term supplies of gas to serve both groups. Costs reflecting these commitments have therefore traditionally been considered the responsibility of both groups....
 
 
 6
 Partial requirements customers have the ability to swing off the system, causing a reduction in expected sales volumes which, in turn, creates an underrecovery of costs. If the pipeline is unable to make up the lost volumes by selling the excess supply elsewhere, it may file new rates to offset the decreased sales. In these new rates, the pipeline's fixed costs will be spread over the lower volumes the pipeline expects to sell, resulting in higher rates on that system. Although the higher rates will apply to all customers, the captive customers have no alternative to paying these rates, at least in the short run, while the swing customers (absent a minimum commodity bill) can avoid higher commodity charges.
 
 
 7
 Order No. 130, Elimination of Variable Costs from Certain Natural Gas Pipeline Minimum Bill Provisions, 49 Fed.Reg. 22,778, 22,780 (June 1, 1984), appeal argued sub. nom. Wisconsin Gas Co. v. FERC, No. 84-1358 (D.C.Cir. Apr. 2, 1985) [hereinafter cited as Rulemaking ].
 
 
 8
 Minimum commodity bills are intended to alleviate this regulatory tension by requiring partial requirements customers to pay some portion of the commodity charge for a contractually specified quantity of gas regardless of whether those customers actually purchase that quantity. Given the competing interests of full requirements and partial requirements customers, such bills can be defended on two general grounds. First, they protect pipeline suppliers from the risk of underrecovering some of the fixed costs allocated to the commodity charge if partial requirements customers choose to purchase large quantitites of cheaper gas from other suppliers. Second, they protect the full requirements customers from bearing a disproportionate share of the supplier's fixed costs if substantial swinging by partial requirements customers forces the supplier to raise its overall rates. See id. at 22,78 0. The Commission has also recognized, however, that minimum commodity bills operate as a substantial barrier to competition because they force partial requirements customers to forego the purchase of less expensive gas from another supplier. See id. at 22,779, 22,782-84. In the long run, then, minimum bills could result in higher rates for all customers on a pipeline system by isolating the major supplier from market competition and reducing its incentive to minimize costs and prices. See id.
 
 
 9
 The general legal framework for minimum bill regulation was developed in the course of a landmark 1960's dispute that produced two rounds of decisions by both the Commission and this court. In Lynchburg Gas Co. v. FPC, 336 F.2d 942 (D.C.Cir.1964), this court reviewed a Commission order approving a minimum commodity bill under the general rationale that such bills protect a supplier's full requirements customers from potential rate increases resulting from swings. After expressing a broad concern that the anticompetitive impact of minimum bills conflicts with the goals of the Act, we concluded that the Commission could not authorize minimum bills under that general rationale in the absence of specific "subsidiary findings based on the record." Lynchburg, 336 F.2d at 947. In particular, we held that the Commission could not simply assume that a particular minimum bill reasonably accommodated the competing interests of a pipeline supplier's customers without an evidentiary showing that the supplier could not accommodate swings without raising its rates and that specific captive customers will suffer the consequences of increased rates. See id. at 947-48; see also id. at 950 (Washington, J., concurring). We also concluded that the Commission must ensure that the particular minimum bill before it is carefully designed to balance the conflicting interests of full and partial requirements customers and that it is "no more restrictive than necessary." Id. at 947 (quoting White Motor Co. v. United States, 372 U.S. 253, 270, 83 S.Ct. 696, 705, 9 L.Ed.2d 738 (1963) (Brennan, J., concurring)).
 
 
 10
 In response to the concerns articulated in Lynchburg, the Commission developed its own minimum bill standards on remand. The Commission determined that a minimum bill could be justified if the supplier could demonstrate, on the basis of substantial evidence, that the bill was specifically and narrowly designed to meet one of three goals: "(1) the recovery of that portion of a pipeline's rates which allocates fixed costs to the commodity component, (2) the protection of customers with no alternate supply from having to bear the costs of facilities constructed for a customer which obtains an alternative source, and (3) [the recovery of] the minimum take or pay obligation which a pipeline has to its suppliers." Atlantic Seaboard Corp., 38 F.P.C. 91, 95 (1962), aff'd, 404 F.2d 1268 (D.C.Cir.1968).[4] In order to justify the restraint on competition imposed by minimum bills, the Commission reasoned, a pipeline supplier must demonstrate that it actually needs a minimum bill to protect its system in light of these "substantive economic factors," id., and that its particular bill is specifically and narrowly designed to perform that function. See id. at 96 ("In designing a justifiable minimum commodity rate, [the supplier] should carefully consider [these] factors ... and should avoid one designed to discourage customers from seeking another source of supply."). The Commission eventually concluded that the Lynchburg supplier's bare evidence concerning decreased sales and the presence of some full requirements customers on its system could not justify the imposition of a minimum bill under these standards. See id.
 
 
 11
 In Atlantic Seaboard Corporation v. FPC, 404 F.2d 1268 (D.C.Cir.1968), this court affirmed the Commission's bottom line ruling that the supplier had not justified the imposition of a minimum bill. See id. at 1274-75. We did not, however, hold that the Commission's Atlantic Seaboard standards were mandated by the Act or even that the Commission would necessarily discharge its responsibilities under the Act by determining that minimum bills satisfied those criteria. Instead, we stated that the Commission must ensure that specific minimum bills do not discourage the appropriate level of competition on a particular pipeline system.
 
 
 12
 [A] policy favoring effective competition necessarily brings with it the reality of economic pinch, present or threatened. The presence of a second seller means that the historic supplier loses out on sales it would have otherwise had.... It is through the enhanced efforts made by the supplier in response to such pressure that competition reaps its benefits. The hard problem then is not whether competition may hurt but rather where and how to draw the lines of acceptable range of competition and hurt, in response to the economic characteristics and interrelationships of the industry that require regulation in the first place.
 
 
 13
 Id. at 1272-73. Thus we insisted that the Commission determine, on the basis of substantial record evidence, that a minimum bill is actually necessary to protect the supplier and its customers from too painful a "pinch" of unrestrained competition and that the particular minimum bill proposed is specifically designed to do so. See id. at 1273-74.
 
 
 14
 The Commission has subsequently attempted to fulfill this mandate by applying its Atlantic Seaboard standards to minimum bill proposals. To conform to our Lynchburg and Atlantic Seaboard opinions, we believe that those standards must be read to require two inquiries concerning any proposed minimum bill. First, the Commission must determine, on the basis of substantial record evidence, that a supplier in fact requires a minimum bill to remedy a regulatory difficulty recognized in Atlantic Seaboard. Second, the Commission must ensure that the particular minimum bill proposed is specifically designed to achieve that remedy, but nothing more. See e.g., Manufacturer's Light & Heat Co., 44 F.P.C. 1219, 1238-41 (1970) (rejecting a proposed minimum bill because the supplier had failed to sustain its "burden of justification" that any bill was necessary to recover fixed costs or to protect full requirements customers and had failed to show that its particular minimum bill was specifically designed to remedy a problem recognized in Atlantic Seaboard ).
 
 B. The Proceedings in This Case
 
 15
 Against this regulatory backdrop, United sought to impose a far-reaching minimum commodity bill on its partial requirements customers in 1981. Under that initial bill, United proposed to collect the full commodity charge--including both fixed and variable costs--for at least two-thirds of each pipelines' maximum daily quantity[5] regardless of whether the pipeline customers purchased that amount of gas. United proposed to assess minimum payment obligations on a monthly basis, but the minimum bill would not apply in any month when United exercised its contractual right to curtail supplies.[6] United did not seek to impose any minimum bill on its city-gate customers. MRT, Laclede and several other parties filed timely protests concerning United's proposed tariff. FERC provisionally accepted the filing and set the case for hearing before an administrative law judge (ALJ).
 
 
 16
 In an initial decision issued on June 29, 1983, the ALJ rejected virtually every aspect of United's proposed minimum bill. See United Gas Pipe Line Co., 23 F.E.R.C. p 63,125 (1983) [hereinafter cited as ALJ Opinion ]. Although the ALJ found that United could impose a minimum bill only on its pipeline customers without violating the anti-discrimination sections of the Act, he concluded that the proposed minimum bill was "fatally flawed at the threshold" because United had not produced substantial evidence that its proposal satisfied the Atlantic Seaboard standards. See id. at 65,349. The ALJ found that United had not produced substantial evidence that it would be unable to recover fixed costs in the absence of a minimum bill. See id. at 65,351. He also concluded that United had failed to demonstrate that it needed a minimum bill to protect its full requirements customers from rate increases or that its specific proposal was narrowly designed to do so. See id. Although the ALJ suggested that United's proposed bill constituted an impermissible restraint on competition in light of Lynchburg, he based his rejection on United's failure to show that any minimum bill was necessary under the Commission's Atlantic Seaboard standards. See id.
 
 
 17
 After the ALJ's decision, United withdrew its proposal and entered into settlement negotiations with its pipeline customers. Shortly thereafter, United filed a substantially revised offer of settlement concerning minimum bill charges. The settlement bill differs from United's initially proposed tariff in three ways: (1) it collects only the fixed costs allocated to the commodity charge rather than both fixed and variable costs, (2) it computes minimum purchasing obligations on an annual rather than a monthly basis, and (3) it bases minimum quantity obligations on each pipeline's historical purchasing patterns rather than on a percentage of a pipeline's maximum daily quantity. The settlement bill also relieves the pipeline customers of a portion of their minimum payment obligations whenever United goes into curtailment. After United filed the proposed agreement, MRT and Laclede decided to oppose the settlement bill. In its comments, MRT pointed out that United had not developed any evidence concerning the effects of the settlement bill and that the ALJ had specifically found that United had failed to justify the imposition of any minimum bill under the Atlantic Seaboard standards. See Comments of Mississippi River Transmission Corporation in Opposition to Stipulation and Agreement Relating to Minimum Commodity Bill, Docket No. RP82-16-000 (August 18, 1983), Joint Appendix ("JA") at 519-34.
 
 
 18
 On October 18, 1983, the Commission, without taking additional evidence on the settlement proposal, approved United's minimum bill over MRT's and Laclede's objections. See United Gas Pipe Line Co., 25 F.E.R.C. p 61,088 (1983) [hereinafter cited as FERC Opinion ].[7] Although FERC observed that the bill could restrain competition by requiring the pipeline customers to purchase high cost gas from United when lower cost supplies are available, it asserted that the contested settlement met the first two Atlantic Seaboard standards because the bill ensures that United will recover the "greater portion of its fixed costs," and it protects full requirements customers from the potential adverse effects of substantial pipeline swings. See id. at 61,297.[8] Significantly, however, FERC neither cited to any record evidence in support of this conclusion nor even mentioned the ALJ's ruling that United had failed to produce evidence justifying the imposition of any minimum commodity bill. FERC also rejected the petitioner's discrimination claims. See id.
 
 
 19
 In their petition to this court, MRT and Leclede argue that FERC failed to justify the anticompetitive impact of United's minimum bill, that FERC's assertion that the bill satisfied its own Atlantic Seaboard test was not supported by substantial record evidence, and that the bill unduly discriminates among United customers. Although the Commission enjoys substantial discretion in balancing the competing interests involved in natural gas pipeline regulation, see, e.g., Atlantic Seaboard, 404 F.2d at 1271-72, we agree with the petitioners that FERC failed to base the application of its Atlantic Seaboard test to United's bill on substantial record evidence.[9]II. FERC's APPLICATION OF THE Atlantic Seaboard STANDARDS
 
 
 20
 United bore the burden of demonstrating that its proposed minimum bill was just and reasonable under the Act. See 15 U.S.C. Sec. 717c(e); Transcontinental Gas Pipe Line Corp., 11 F.P.C. 94, 97 (1952). After considering the extensive record compiled in the initial hearing, the ALJ concluded that "United ha[d] not presented reliable, probative and substantial evidence to show that the proposed minimum commodity bill comports with the standards adopted by the Commission in the Atlantic Seaboard case." ALJ Opinion, 23 F.E.R.C. at 65,351. Although the ALJ was primarily concerned with United's initial proposal, he found that United had failed to produce substantial evidence demonstrating that any minimum bill was necessary to ensure fixed cost recovery or to protect United's full requirements customers. See id. As we explain below, that threshold finding applies with equal force to the settlement bill, and the Commission has neither pointed to any record evidence disputing the ALJ's findings nor explained how the settlement bill cured the evidentiary deficiencies that compelled the ALJ to reject United's initial proposal.[10]
 
 A. Fixed Cost Recovery
 
 21
 As we indicated earlier, see supra p. 948, United's current rate structure guarantees that it will recover at least 25 percent of its fixed costs through the demand charge. United thus theoretically risks underrecovering a portion of the 75 percent of its fixed costs collected by the commodity charge if its overall sales decline dramatically. As FERC has recently noted, minimum bills "have protected pipelines from the risk of underrecovering fixed costs in the commodity component of rates, up to a particular level. As such, they have acted as a kind of additional demand charge." Rulemaking, 49 Fed.Reg. at 22,780. In order to justify a minimum bill under the fixed cost recovery theory embodied in the first Atlantic Seaboard standard, a supplier must at least show that it actually risks substantial underrecovery of fixed costs in the absence of such a bill.
 
 
 22
 In approving United's minimum bill, however, FERC simply restated the general Atlantic Seaboard rationale without discussing any such showing.
 
 
 23
 United's existing rates are designed so that 75 percent of its fixed costs are recovered through the commodity component of the rates. So, the settlement minimum bill guarantees that the pipeline will be able to recover the greater portion of its fixed costs. However, the settlement does not permit United to collect any variable costs through its minimum commodity bill.
 
 
 24
 FERC Opinion, 25 F.E.R.C. at 61,297. FERC thus did not point to any record evidence indicating that United was unable to recover "the greater portion" of its fixed costs in the absence of a minimum bill. At the hearing on United's initial proposal, however, FERC's staff witness stated that nothing "in this docket would indicate that United would be unable to recover its fixed costs under its existing tariff without a minimum bill." Winfield Testimony, JA at 836; see also FERC Staff Brief at vii, 11, 17, JA at 315, 329, 335 (noting that United had failed to produce evidence of possible fixed cost underrecovery). The record also suggests that United itself did not seek a minimum bill to shield against the possibility of fixed cost underrecovery.[11] Accordingly, the ALJ found that United had failed to establish that it could not recover its fixed costs in the absence of a minimum bill and thus that no minimum bill could be justified under the first Atlantic Seaboard standard. See ALJ Opinion, 23 F.E.R.C. at 65,346, 65,349, 65,351-52.
 
 
 25
 United advances two arguments why the settlement minimum bill satisfies the fixed cost recovery standard despite the ALJ's ruling. First, United suggests that the ALJ's analysis is largely irrelevant to the FERC order under review because United's initial proposal sought to recover the variable costs as well as the fixed costs allocated to the commodity charge. Yet United must demonstrate a substantial risk of fixed cost underrecovery in order to justify the imposition of any minimum bill, including the settlement bill, under the first Atlantic Seaboard test. See Atlantic Seaboard, 38 F.P.C. at 95. The fact that the settlement bill is narrower than the initial proposal thus cannot alter the ALJ's conclusion that United had failed to make a threshold showing under the fixed cost recovery standard. Significantly, neither party has cited this court to any record evidence indicating that United actually risks substantial fixed cost underrecovery without a minimum bill or supporting FERC's conclusion that the settlement bill was necessary to recover the "greater portion" of United's fixed costs.[12] While we recognize that the inclusion of variable costs raises even more serious questions concerning minimum bills, see Rulemaking, 49 Fed.Reg. at 22,780-83, we do not believe that the Commission can reflexively approve any minimum bill limited to fixed cost recovery in the absence of actual evidence indicating that the supplier could not otherwise recover those costs. Cf. Lynchburg, 396 F.2d at 950 (Washington, J., concurring).[13]
 
 
 26
 Second, United suggests that the settlement bill should be deemed just and reasonable because its current rate schedule is predicated on the fixed cost recovery guaranteed by the bill.[14] This argument provides no support for FERC's order. The Commission, of course, did not rely on this rationale, and no record evidence before us indicates that the settlement bill and United's rate structure were coordinated to achieve a reasonable allocation of fixed costs responsibility among United's customers. Moreover, an otherwise unlawful order of the Commission cannot be sustained merely because a party subsequently relied on the deficient agency action. To do so would be to "give legal effect to the Commission's invalid order." Williams v. Washington Metropolitan Area Transit Comm., 415 F.2d 922, 943 (D.C.Cir.1968), cert. denied, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969). In sum, we cannot say that the Commission's bare assertion that United's minimum bill met the first Atlantic Seaboard standard was supported by subsidiary findings based on substantial record evidence.
 
 
 27
 B. The Protection of Full Requirements Customers
 
 
 28
 In order to justify a minimum bill under the second Atlantic Seaboard standard, a supplier must specifically demonstrate that particular full requirements or captive customers are likely to bear higher overall rates as a result of off-system purchases by partial requirements customers. See Lynchburg, 336 F.2d at 947; Atlantic Seaboard, 38 F.P.C. at 95; supra p. 950. In this case, however, the Commission merely recited the general hypothesis that if United's pipeline customers substantially reduce their purchases from United, its city gate customers might face higher rates if United is unable to increase sales to its other customers, including its nonjurisdictional customers. See FERC Opinion, 25 F.E.R.C. at 61,297. FERC did not attempt to evaluate this general rationale in light of any record evidence concerning the actual effects of swings by United's pipeline customers or United's ability to accommodate such swings without raising its rates. In particular, FERC did not even mention the ALJ's conclusion that "there is no evidence in this record to connect the load loss experienced by United with swings by the [pipeline] customers to justify a minimum commodity bill to protect the full requirements customers from higher rates necessary to recover fixed costs." ALJ Opinion, 23 F.E.R.C. at 65,352 (emphasis added). As we unequivocally held in Lynchburg, FERC cannot justify a particular minimum bill by merely stating the general regulatory rationale for such bills. See Lynchburg, 336 F.2d at 947-48; cf. Environmental Defense Fund, Inc. v. Ruckelshaus, 439 F.2d 584, 598 (D.C.Cir.1971).[15]
 
 
 29
 As the ALJ found, moreover, the record in this case is devoid of substantial evidence indicating that United needs a minimum bill to protect its full requirements customers from the adverse effects of swings by the pipelines. To begin with, United failed to demonstrate that pipeline swings have been responsible for United's recent load losses. United did present evidence concerning fluctuations in takes by its customers as a whole and load losses in general. See Borque Testimony, JA at 81-98, 100-21, 1023-34. The record also contains evidence indicating that United sells a large portion of its gas to its pipeline customers and that those customers have the capacity to seek cheaper gas supplies from alternative suppliers. See ALJ Opinion, 23 F.E.R.C. at 65,343-44. Yet United made no attempt to quantify, even with minimal accuracy, the extent to which its sales fluctuations have resulted from swings by partial requirements customers rather than from other factors outside the control of its customers. See id. at 65,349.[16] Neither does the record indicate that pipeline swings have been, or are expected to be, responsible for a greater than average portion of United's load losses.[17]
 
 
 30
 Similarly, the Commission did not cite any record evidence suggesting that United cannot accommodate pipeline swings without raising its overall rates. Pipeline swings would not force United to raise its overall rates if United could decrease its unit fixed costs or increase its systemwide sales. Cf. ALJ Opinion, 23 F.E.R.C. at 65,344, 65,350-51; see also Lynchburg, 336 F.2d at 947. This court concluded in Lynchburg that "the Commission could not simply assume that disapproval of the [minimum bill] would result in such a serious deterioration of [the supplier's] markets as to necessitate an increase in [the supplier's] general rates and thus place an unfair burden upon [the supplier's] less favorably situated customers.... [T]he validity of [a minimum bill] must be supported by more than judicial speculation that it is justified." Lynchburg, 336 F.2d at 948. By failing to discuss the ALJ's findings or to point to any record evidence concerning the actual applicability of the second Atlantic Seaboard standard to United's minimum bill, the Commission repeated the same mistake it made in Lynchburg.
 
 
 31
 We therefore conclude that the Commission failed to base its Atlantic Seaboard analysis on substantial record evidence. Although the settlement bill differed significantly from United's initial proposal, the ALJ concluded that United had failed to justify any minimum bill under the Atlantic Seaboard standards. Given that conclusion, FERC could not approve that settlement bill in the absence of substantial record evidence by simply reciting the general regulatory rationale for minimum bills. See generally Greater Boston Television Corp. v. FCC, 444 F.2d 841, 853 (D.C.Cir.1970) ("The agency's departure from the [ALJ's] findings are vulnerable if they do not reflect attentive consideration to the [ALJ's] decision."), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).
 
 III. THE DISCRIMINATION CLAIM
 
 32
 The petitioners also argue that FERC's decision authorizing United to impose its minimum bill on United's pipeline customers, but not on its city gate customers, constitutes unlawful discrimination under the Act.[18] Both the Commission and the ALJ concluded that United's bill was not unduly discriminatory because the city gate customers, as a class, do not have any significant ability to control their demand from United.
 
 
 33
 [W]e find that United's PL-N and city gate customers are sufficiently dissimilar that United's failure to make the minimum bill applicable to the latter group does not constitute undue discrimination. United's city gate customers do not have the ability to swing their purchases to the extent PL-N customers have. The record shows that the city gate customers obtain only a small fraction of their gas supplies from sources other than United. The city gates generally have smaller systems than the PL-N customers, and unlike the pipelines, have little storage or peak-shaving capability. They have relatively low load factor demands and generally serve discrete geographic areas. Thus, they have little ability to control their demand for gas from United.
 
 
 34
 FERC Opinion, 25 F.E.R.C. at 61,298; see also ALJ Opinion, 23 F.E.R.C. at 65,352 (finding that the record supports the claim that a minimum bill applied only to the pipeline customers does not unreasonably discriminate among United's customers). Substantial record evidence supports this subsidiary finding. See, e.g., Borque Testimony, JA at 914-43, 1154-55; Smith Testimony, JA at 706-18.
 
 
 35
 Courts have consistently held that differential rate structures do not constitute unreasonable discrimination where substantial evidence indicates relevant differences among general classes of pipeline customers. See, e.g., United Mun. Distribs. Group v. FERC, 732 F.2d 202, 212 (D.C.Cir.1984); Elizabethtown Gas Co. v. FERC, 636 F.2d 1328, 1334 (D.C.Cir.1980); Michigan Consol. Gas Co. v. FERC, 203 F.2d 895, 901 (3d Cir.1953). Accordingly, we uphold FERC's rejection of the discrimination claim. On remand, however, FERC should feel free to revisit this issue in light of its recent actions authorizing two of United's city gate customers to purchase cheaper gas from suppliers other than United. See Southern Natural Gas Co., 30 F.E.R.C. p 61,027 (1985); Natural Gas Pipeline Co. of Am., 30 F.E.R.C. p 61,017 (1985). These actions may indicate that at least some of United's city gate customers are currently not as captive as the Commission concluded. Of course, we intimate no view as to the proper resolution of that issue.[19]IV. CONCLUSION
 
 
 36
 Assuming that the Atlantic Seaboard criteria constitute reasonable regulatory standards, we hold the Commission failed to base its application of those standards to United's minimum bill on substantial record evidence. The Commission did not cite or discuss the record that convinced the ALJ to reject United's proposal to impose a minimum bill on its pipeline customers. Neither did it subject United's second proposal to a new hearing despite the petitioners' protests that United had failed to produce record evidence justifying a minimum bill under the Atlantic Seaboard standards. Although the Commission was not required to hold a full scale hearing on the settlement bill, it was unquestionably obliged to support its order through subsidiary findings based on substantial evidence in the record as a whole. See Lynchburg, 336 F.2d at 947; Atlantic Seaboard, 404 F.2d at 1274. The Commission most assuredly did not do that here. On remand, the Commission can develop further evidence concerning United's minimum bill or it can attempt to base its decision on the current record. To fulfill its responsibilities under the Act, however, FERC must apply its minimum bill standards to the actual record evidence concerning United's proposal.
 
 
 37
 So Ordered.
 
 
 
 [1]
 United's sales to its industrial customers fall outside the Commission's jurisdiction
 
 
 [2]
 Intervenors Mobile Gas Service Corporation, Mississippi Valley Gas Company, Clark-Mobile Counties Gas District, Entex Incorporated, and Louisiana Gas Service Company are city gate customers of United. They appear for the limited purpose of defending FERC's conclusion that United can impose its minimum bill only on its pipeline customers without violating the anti-discrimination provisions of the Act. They do not, however, support United's attempt to impose a minimum bill on any of its customers
 
 
 [3]
 "Fixed costs" consist primarily of the capital and plant-related costs that do not vary with the level of actual gas sales by a supplier; they are generally the costs incurred by a supplier in order to stand ready to provide service. See P. Garfield & W. Lovejoy, Public Utility Economics 172 (1964). "Variable costs" are incurred in proportion to the actual thorough-put or volumes of delivery on a pipeline. Although the main variable cost is the cost of purchased gas, variable costs also included certain maintenance and operational expenses related to pipeline transmission
 
 
 [4]
 The third Atlantic Seaboard criterion refers to "take or pay" clauses in contracts between pipeline suppliers such as United and natural gas producers under which the supplier agrees to pay the producer for a certain quantity of gas regardless of the supplier's actual distribution needs. A supplier may thus incur take-or-pay costs if it cannot sell its minimum take-or-pay quantities. If prudently incurred, a supplier's take-or-pay costs are eligible to be placed in the supplier's cost base for the purposes of a general rate increase filing. See Rulemaking, 49 Fed.Reg. at 22,780. See generally Wisconsin Gas Co. v. FERC, 758 F.2d 669, 673 n. 8 (D.C.Cir. 1985). The take-or-pay standard is not at issue in this case. See infra note 8
 
 
 [5]
 A customer's maximum daily quantity is the maximum volume of gas that the customer has a right to demand under its service agreement. See Consolidated Gas Supply Corp. v. FPC, 520 F.2d 1176, 1178 (D.C.Cir.1975)
 
 
 [6]
 Under its current tariff, United has a unilateral right to curtail gas supplies to its jurisdictional customers under adverse conditions or when it cannot meet actual demand. Between 1970 and 1982, United was in frequent, prolonged and deep curtailment every year. See United Gas Pipeline Co., 23 F.E.R.C. p 63,125 at 65,349 (1983). United's history of curtailment, MRT suggests, forced its pipeline customers to develop the ability to purchase gas from other more reliable and cheaper pipeline suppliers. See MRT's Brief at 8
 
 
 [7]
 A FERC order approving a contested settlement ordinarily constitutes a decision on the merits. FERC's procedural rules provide that:
 If the Commission determines that any offer of settlement is contested in whole or in part, by any party, the Commission may decide the merits of the contested settlement issues, if the record contains substantial evidence upon which to base a reasoned decision or the Commission determines there is no genuine issue of material fact.
 (ii) If the Commission finds that the record lacks substantial evidence or that the contested issues cannot be severed from the offer of settlement, the Commission will:
 (A) Establish procedures for the purpose of receiving additional evidence before a presiding officer upon which a decision on the contested issues may reasonably be based; or
 (B) Take other action which the Commission determines to be appropriate.
 See FERC Rule 602(h), 18 C.F.R. Sec. 385.602(h) (1984). See generally United Mun. Distribs. Group v. FERC, 732 F.2d 202, 207-210 (D.C.Cir.1984) (discussing Rule 602(h)). Although FERC was thus free to develop further evidence on the contested settlement bill, see e.g., Potomac Edison Co., 17 F.E.R.C. p 61,167 (1981), it decided to approve United's bill on the merits under its Atlantic Seaboard test. See FERC Opinion, 25 F.E.R.C. at 61,298; FERC's Brief at 15 n. 19.
 
 
 [8]
 FERC did not in any way rely on the take-or-pay factor to justify its order. The Commission also rejected MRT's argument that the bill unjustly penalized the pipeline customers for developing alternative suppliers in view of United's consistent history of curtailing its supplies. See supra note 6. FERC concluded that the bill reasonably responds to this concern by basing the required minimum quantities on the pipeline customers' historical purchasing patterns. See FERC Opinion, 25 F.E.R.C. at 61,298
 
 
 [9]
 The contested settlement agreement provides that any party affected by the minimum bill may unilaterally initiate proceedings before the Commission seeking to modify or delete the bill on or after January 1, 1985. See Settlement Agreement p 2, JA at 500-01. FERC now argues that the petitioner's appeal no longer presents a live case or controversy because MRT has not incurred any actual liabilities under the minimum bill (and thus cannot seek any refund), and the petitioners can obtain full prospective relief by petitioning the Commission for reconsideration under the terms of the agreement. We do not believe that FERC can cut off judicial review merely by allowing parties to rechallenge rate tariffs before the agency after one year
 In order to determine that intervening relief or events have mooted a case or controversy, a court must at least be able to conclude "with assurance that 'there is no reasonable expectation' that the violation will recur." County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)). Outside the class action context, the defendant must therefore demonstrate that "the same complaining party [will not] be subjected to the same action again." Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975). As the Supreme Court has emphasized, moreover, "the burden of demonstrating mootness 'is a heavy one.' " Id. (quoting Grant, 345 U.S. at 632-33, 73 S.Ct. at 897-98). See generally Doe v. Harris, 696 F.2d 109, 111-14 (D.C.Cir.1982) (discussing the Davis standard).
 The Commission has not demonstrated that the presence of the reopener clause in the contested settlement agreement satisfies this standard. FERC has given us absolutely no indication that the petitioners will not again be subject to the alleged violation challenged in this case, namely the Commission's failure to account for the anticompetitive impact of United's bill and its failure to base its Atlantic Seaboard analysis on substantial evidence. The fact that FERC has the authority to remedy its alleged shortcomings in reopened proceedings provides no assurance that it will actually do so. Cf. Harris, 696 F.2d at 112-13 & n. 6. See generally Coleman v. Califano, 631 F.2d 324 (4th Cir.1980) (holding that an agency's voluntary decision to reconsider a challenged action does not render a case moot absent a reasonable assurance that the wrong will not be repeated).
 
 
 [10]
 The petitioners argue that our opinions in Lynchburg and Atlantic Seaboard impose an independent duty on FERC to ensure that a particular minimum bill is the least anticompetitive means of attaining a legitimate regulatory goal regardless of whether the bill satisfies the Commission's Atlantic Seaboard criteria. See MRT's Brief at 33-36; Laclede's Brief at 23-24. FERC has itself stated that "fostering competition is not only an appropriate goal but must take a high priority in the values which the Commission considers when it determines whether rate structures [including minimum bills] are just and reasonable." Rulemaking, 49 Fed.Reg. at 22,784 (emphasis added); see also Kentucky Utilities Co., 23 F.E.R.C. p 61,317 (1983); Florida Power & Light Co., 8 F.E.R.C. p 61,121 (1979); see generally Northern Natural Gas Co. v. FPC, 399 F.2d 953, 964-65 (D.C.Cir.1968). These cases certainly require the Commission to take seriously the anti-competitive effects of minimum commodity bills. See, e.g., Rulemaking; 49 Fed.Reg. at 22,782-89 (undertaking a detailed analysis of the anti-competitive impact of minimum bills that include variable costs). We need not determine here, however, the precise extent to which FERC has an independent obligation to justify restraints on competition notwithstanding compliance with the Atlantic Seaboard standards because we conclude that the Commission failed to base its threshold assessment under those standards on substantial record evidence
 
 
 [11]
 One of United's witnesses, for example, testified that United would have sought a minimum bill even if it could have revised its current two-part rate structure to guarantee the recovery of all fixed costs
 [ALJ]: Let me ask you this. If United did not have any portion of fixed costs in the commodity rate or the commodity component of the two-part rate, would the company have filed a minimum bill tariff?
 [UNITED'S] WITNESS: If the company has experienced an extremely abrupt reduction in sales, it's going to impact its ability to acquire long-term reserves to serve those very same customers, which has little to do with the recovery of the fixed costs.
 [ALJ]: Is your answer, then, that regardless of the rate design and the classification of fixed and variable costs, as United may or may not--may do as part of its ratemaking process, the minimum bill tariff would have been filed anyway?
 [UNITED'S] WITNESS: Yes your Honor.
 Borque Testimony, JA at 1048. At other points in the hearing on the initial proposal, United's witnesses stated that the purpose of the minimum bill was to "define the market" or to "ameliorate problems that were reflected by prior market structure." Borque Testimony, JA at 912. This testimony suggests that at least United's initial proposal was not specifically designed to shield against the possibility of fixed cost underrecovery, and the Commission has not pointed to any evidence that the settlement bill was differently motivated.
 
 
 [12]
 Although FERC and United now cite us to general statements in the record suggesting that the recovery of fixed costs through a minimum bill often constitutes a legitimate regulatory goal, none of these statements indicate that United was in fact unable to recover the "greater portion" of its fixed costs in the absence of a minimum bill
 
 
 [13]
 The Commission did not consider, for example, whether the settlement bill will enable United to over recover its fixed costs if the pipeline customers choose to pay minimum bill penalties and United is still able to sell its predicted quantity of gas. Cf. ALJ Opinion, 23 F.E.R.C. at 65,351 (discussing the substantial likelihood that United would overrecover fixed and variable costs under its initial proposal). In view of the record evidence that United could recover its fixed costs in the absence of a minimum bill, the possibility of overrecovery seems a substantial one. See Winfield Testimony, JA at 836; Meade Testimony, JA at 143-44
 Moreover, nothing in the Act requires that pipeline suppliers be insulated from risk or competition through a guarantee of total fixed cost recovery, see FPC v. Natural Gas Pipeline Co. of Am., 315 U.S. 575, 590, 62 S.Ct. 736, 745, 86 L.Ed. 1037 (1942); Consolidated Gas Supply Corp. v. FPC, 520 F.2d 1176, 1180 (D.C.Cir.1975), and a minimum bill that guaranteed complete or substantially complete fixed cost recovery would significantly reduce United's incentives to minimize long-term costs and prices. Cf. United Gas Pipe Line Co., 26 F.E.R.C. p 61,287 at 61,652-53 (noting that United's rate structure is presently designed to result in some cost underrecovery so that United will be forced to cut costs and improve its sales and transportation performance). In this case, the Commission has not explained whether the level of fixed cost recovery ensured by the settlement bill strikes a reasonable balance between the preservation of market incentives for United and its need for a reasonable opportunity to recover prudently incurred fixed costs.
 
 
 [14]
 United's current rate structure was determined by negotiation after the settlement bill was approved by the Commission. See United Gas Pipe Line Co., 26 F.E.R.C. p 61,287 (1984)
 
 
 [15]
 In its brief, the Commission argues that minimum commodity bills perform essentially the same regulatory function as the "demand ratchets" we have approved in electric utility cases. See, e.g., Cities of Batavia v. FERC, 672 F.2d 64, 84 (D.C.Cir.1982) (upholding FERC's approval of a demand ratchet). The Commission, however, did not rely on any such analogy in approving United's minimum bill, and nothing in the record reveals the relevance of electricity ratemaking concepts to minimum commodity bills imposed on natural gas pipelines. The demand ratchet argument thus appears to be a post-hoc rationalization of counsel. Moreover, we doubt that electricity rate design concepts can be transplanted into natural gas pipeline regulation without any inquiry into the possible differences between the two fields of regulation. Evidently, the Commission shares our concerns. See, e.g., Delmarva Power & Light Co., 25 F.E.R.C. p 61,022 at 61,121 (1983) (refusing to apply natural gas rate concepts to an electric utility's rate structure)
 
 
 [16]
 As the ALJ noted, United's sales fluctuation data reflects a number of factors unrelated to pipeline swings such as weather and seasonal changes, changing economic conditions, storage withdrawal or injection, and operational constraints. See ALJ Opinion, 23 F.E.R.C. at 65,344-45
 
 
 [17]
 The sales data submitted by United clearly indicates that all of its customers--the pipelines, the city gates and the industrial users--have reduced their takes over the past few years. See ALJ Opinion, 23 F.E.R.C. at 65,343-44. The parties have not pointed to anything in this data suggesting that the pipeline customers have reduced their purchases from United to an extent greater than any other customer class. If anything, the record indicates that reductions in takes by United's nonjurisdictional industrial customers are responsible for the greatest portion of United's overall load loss. See Borque Testimony, JA at 951-52 (noting that 81 percent of the total reduction in demand was attributable to reduced takes by nonjurisdictional customers)
 
 
 [18]
 Section 4(b) of the Act provides
 No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.
 15 U.S.C. 717c(b).
 
 
 [19]
 The increased ability of some city gate customers to swing from United's system is also a relevant consideration in determining whether any minimum bill is justified under the Atlantic Seaboard standards. See supra p. 949. As we observed in Lynchburg, the Commission cannot strike a reasonable balance between full requirements and partial requirements customers without specifying which customers lack access to alternative gas supplies. See Lynchburg, 336 F.2d at 947